Regis O’Brien, J.
This is an action in which the plaintiffs seek to enjoin the defendant permanently from constructing a gasoline station on a corner of his premises situate at the junction of Portage Road and Creek Road Extension in the village of Lewiston.
The testimony reveals that originally the Village Board of Lewiston designated the property as being in a “ Residential Use District”, under its “Zoning Ordinance” and “Zoning Map ” adopted in 1941.
In December, 1944 the defendant instituted proceedings to have the zoning restriction changed so as to permit the use of the premises for “Business ” purposes. He presented a petition to the Village Board, reciting, among other things, that he had recently purchased the premises which he described; that said property was zoned for residential purposes; that he was a licensed real estate broker for years in that vicinity; that he was familiar with the requirements of a real estate development in an outlying district and adept in the planning of such type of development and adapting it to the needs 1 ‘ of its occupants by restrictive agreements with them, rather than by municipal residential restrictions ” and that he accordingly sought an amendment to the zoning ordinance and building code as would subject his property to such restrictions as to the buildings which may hereafter be erected thereon and as to the use thereof as shall have mutually been determined and agreed “by him and the adjoining owners.”
Attached to said petition was a document dated September 1, 1945 signed by nine persons purporting to be the owners of the residential and/or vacant lots on the opposite side of Portage Road, Seneca Street, Tuscarora Street and from Outer Lot *21 Number 29 of said village, giving their consent to the Village Board that the premises owned by Leo Hapeman ‘ ‘ may be transferred # * * to a 1 Business Use District ’ for a real estate development thereon, by him, in accordance with his petition
Five of said signers, to wit: Edith and Harry Jarvis, J ames J. and Anne A. Rountree and Miss A. F. Beggs withdrew their names from said consent by an appropriate document dated September 26,1945.
A special meeting of the Village Board was held on September 27,1945, to consider the proposed changes in the zoning ordinances. Various persons spoke for and against defendant’s petition, as aforesaid. The meeting adjourned without any action being taken.
The next activity in respect to the defendant’s property appears to have taken place at the regular monthly meeting of the Village Board held December 2, 1946. At that time Mr. Hapeman again petitioned for an amendment to the zoning ordinance. Action on such petition was ordered deferred.
The petition was substantially the same as the one filed previously. It contained the additional statement, however, that “ your petitioner hereby consents to a restriction whereby no business structure shall be erected upon the above described area within fifty (50) feet either of the easterly line of Portage Street or the northerly lines of Tuscarora Street and of the Creek Road Extension.”
The petition was brought up for consideration before the regular Village Board meeting of January 6,1947. The board, at Mr. Hapeman’s request, voted him permission to withdraw it so that he could file a new petition containing further self-imposed restrictions. The revamped petition sets forth the proposed restriction in the following words: “ (a) no gasoline station shall be erected on the above described area.” The closing paragraph of the petition requested the board to modify and amend the Zoning Ordinance and Building Code of the village so that Mr. Hapeman’s property would be transferred into a business use district, subject to the additional restrictions to which he had consented in his petition.
Filed with the board as a part of the petition were statements of several residents and taxpayers who claimed that they were interested owners of land under section 179 of the Village Law. They joined in petitioning the board to modify and amend the zoning ordinance “ subject however, to the restrictions to which said petitioner Hapeman consented in his petition.”
*22 Section 179 of the Village Law to which reference was made provides, among other things, that a zoning ordinance “ may from time to time be amended, supplemented, changed, modified or repealed by the board of trustees on its own motion or on petition. ’ ’ It also provides that if there is a “ protest against such change ” signed by a certain per centum of certain specified owners of land in the area, such amendment shall not become effective except by the favorable vote of a certain number of the members of the board of trustees. The section, however, is not pertinent for the reason later mentioned.
The revamped petition aforesaid was considered by the board at a special meeting on January 29, 1947, the minutes of which are a part of Exhibit 13.
They reveal that Mr. Hapeman reviewed the history of his efforts leading up to his filing of the petition. He stated that he had learned that there had been objections to his previous petitions because of lack of information on the part of those protesting, as to his specific objectives, and therefore he had revised his petition so as to meet such opposition by submitting definite plans for an outstanding shopping center. He told of his communications with nationally known experts in that type of real estate development and of retaining one of them to visit Lewiston to make a study of his premises for its potentialities for use as residential or business purposes. The gentleman, he revealed, was Mr. Seward H. Mott, director of the Urban Land Institute, Washington, D. C. After completing his study, Mr. Mott made a very enthusiastic report, advising the development of a shopping center on the proposed premises, claiming that such type of development would not only adapt the premises to the best use for Mr. Hapeman but would also result in a development of greatest advantage to all property owners and citizens generally. Mr. Hapeman stated that “ after developing this plan, I took it to the surrounding property owners and submitted it to them and for the most part they seemed very favorable.” He then related how the petition was presented to the board which laid it on the table for the purpose of having an expert from the State Zoning Commission give his opinion on the matter. Mr. Hape-man admits that, in submitting this new petition, “ I have again conceded to the suggestions of the surrounding property owners in removing their only objection, which was that they might have more or less of a glorified gas station center and I have put into my petition that there will not be any on the property.”
Mr. Hapeman explained that his plan was submitted to every one he felt was affected and that it “has met with their approval.” He further stated that “ I did not submit it to the *23 other property owners because I had been advised by my attorney that the only people who had anything to say about the change of zoning were the people within one hundred feet or adjoining or across the street.”
As the subject matter of the petition under discussion progressed, the question arose as to whether or not the premises could be restricted legally to any one particular type of business if the ordinance were amended to permit business generally. In other words, could a permit for a gasoline station be denied in a business use district and could the required space of 40 feet from the lot line be increased to 50 feet for the erection of a building?
Discussion on these legal points resulted in the observation by a participant at the hearing that “ it might be a matter of mechanics as to how that can be done and I don’t care to say that it can be done by a straight zoning change but I do think it can be done by the mechanics that the owner is willing to make the application to restrict his property * * * I think if Mr. Hapeman is willing he could file a paper in the County Clerk’s office. It would be an effective covenant governing the land.”
Mr. Hapeman’s position was thereupon expressed in the following language: ‘ ‘ The town has a zoning restriction that you cannot build any closer than 40 feet from the front lot line. I put 90 feet in my subdivision. That restriction supersedes any town restriction. My petition includes 50 feet back of it. It is part of the petition. It is in there voluntarily and it is 10 feet better than I told the Board in the beginning.” He was asked “ if the Board should feel it isn’t sufficient for you to have it in that petition, would you be willing to incorporate it in a separate instrument and file it in Lockport?” He answered: “ So far as I am concerned, it is in my petition and I expect to live up to it. ’ ’
The acting mayor and three of the four other trustees attended the hearing. Speakers at the hearing, in addition to Mr. Hape-man, were Mr. Weller (property owner across street), Mr. Kenneth Chapman (property owner adjoining), Mr. Broughton (owner on Seneca St.), Mr. Murphy (citizen), Mr. Billings (lot owner affected), Mrs. Rountree (lot owner affected), and Mr. Scovill (citizen).
The next regular meeting of the Village Board was on February 3,1947. The minutes relate that a Mr. John Broughton was present “ in regard to the proposed change in zoning of the property owned by Leo P. Hapeman, on which a public hearing had been held January 29th, 1947.” Various questions were asked by various persons in respect to the matter, whereupon the acting mayor “ called an executive session of the board to reconvene later.”
*24 The minutes state ‘ ‘ upon reconvening in open session ’ ’, Mr. Hapeman offered to the board a certificate of restrictions in the operation of the proposed project. The certificate of restrictions was read, whereupon it was moved by trustee Barnes that upon the signing of the certificate of restrictions and the filing of the same in the village clerk’s and the County Clerk’s office, the petition be approved and the property described in the petition be changed from a “ Residential Use District to a Business Use District.” The resolution was adopted by the affirmative votes of the acting mayor and four trustees. The Mayor was absent.
The proposed certificate of restrictions was attached to the minutes. It recites, among other things, that Mr. Hapeman had petitioned the board to change the classification of his property from residence to business and that he was willing to impose upon his property certain written restrictions as “ consideration of the granting of my petition ”, and to file written evidence of said restrictions with the board and in the County Clerk’s office.
Among the restrictions was number 3 reading “ No tanks, pumps or other equipment for the distribution of gasoline shall be installed or erected nor shall a gasoline station, garage, or auto repair business be operated upon any part of said premises.”
The “ certificate of restrictions ” was filed in the Niagara County Clerk’s office and recorded in Liber 858 of Deeds at page 424 on February 4,1947. The next activity in the sequence of events leading up to this lawsuit seems to have occurred at the meeting of the Village Board on October 2, 1950. The minutes of that meeting reveal that “ Mr. Leo Hapeman appeared before the Board asking relief and removal of certain restrictions which he had imposed on his property located on Portage Road and Seneca Street”.
Trustee Brown proposed that the restrictions imposed by Mr. Hapeman on that portion of his property known as “ subdivision Lot No. 356 ” be cancelled and annulled. It carried by the unanimous votes of Mayor Anderson and trustees Bradshaw, Antolene, Brown and Baddan. The board’s resolution states “ that the Village Board of the Village of Lewiston, New York, hereby consents in writing and gives its approval to the cancellation and annulment of the restrictions as to subdivision lot 356 contained in the Certificate of Restrictions * * * and consents that said restrictions shall no longer be imposed upon, attached to or run with the premises known as subdivision Lot 356”. The minutes are obscure as to the action of the board on Mr. Hapeman’s petition after the adoption of the *25 resolution at the meeting of October 2, 1950. At any rate, it was discussed again at the board’s meeting of January 2, 1951 when a resolution was adopted consenting to the removal of all the self-imposed restrictions on Mr. Hapeman’s property except the one requiring the set-back limitation of 50 feet along the easterly line of the Hapeman property.
On July 1, 1956 application was made by Mr. Hapeman for a permit to erect a concrete ‘1 gasoline sales station ’ ’ on Lot 361 at the corner of Portage and Creek Roads. This application was followed by the presentation to the board of a petition signed by the owners of premises Nos. 1, 16, 34, 42 and 60 Portage Road and 64 Creek Road, asking that the issuance of such permit be withheld and work delayed.
The petitioners claimed that when the Zoning Ordinance was changed to reclassify the property for business use in 1947, it was for the purpose of making it possible to erect a shopping plaza which was not to contain any gasoline service station but that “we have recently learned” that “Mr. Hapeman has leased a portion of this property * * * for the erection of a gasoline service station at the corner of Portage Road and Creek Road Extension. ’ ’ This was the first time that they had learned that in 1951 Mr. Hapeman had requested these restrictions be lifted from his property and- that the board then in office had granted his request.
The petitioners claimed that the action of the board and of Mr. Hapeman, in removing the restrictions as to the use of the premises for a gasoline station, was improper and illegal. The protest was considered by the board at a public meeting on July 16, 1956 but no definite action was taken to cancel the permit issued to Mr. Hapeman to construct the gasoline station.
The complaint in substance alleges that the plaintiffs or predecessors in title as well as the defendant, on January 3, 1947, owned property which, under the Zoning Law of the village, was limited or restricted to use for residential purposes; that the defendant, desiring to have the law amended so as to permit the use of his property for a business use, agreed to restrict the use of his property so that if it were made available for business purposes, he would not erect any gasoline service station thereon and would keep any building erected thereon back at least 50 feet from certain lines and that subsequently the defendant, without knowledge or consent of the plaintiffs, got favorable action from the Village Board, whereby the said restrictions were removed and a permit secured to erect a gasoline station.
*26 The answer denies and admits various allegations of the complaint unnecessary to set out. in detail.
One of the affirmative defenses alleged was that the Village Board duly complied with all conditions of the Zoning Ordinance and Law in granting the permit. In support of this defense it becomes important to analyze and understand just what was the relationship between the plaintiffs, the defendant and the Village Board in 1947 when the Zoning Law was changed and the defendant’s premises reallocated to a business use district from a residential one.
There is ample and credible testimony in support of the plaintiffs’ claims that the defendant discussed with each of them his willingness to place restrictions on the use of his premises if they would consent to his petition to have his property zoned for a business use by the Village Board. There is also convincing testimony that he said that he would erect a shopping plaza and not use any part of his property for a gas station, and that he would set his buildings back not less than 50 feet from the lot lines. These statements were made generally by the defendant in his conversations pertaining to the super market and his sketches showing the type of shopping plaza which he intended to construct but in none of his conversations was there a definite promise reduced to writing which would constitute an enforcible covenant running with the land.
At the subsequent public hearing on the petition, the discussion veered off on the legality of the board’s authority to impose a restriction which would exclude a business use in a business district. Whether it was intended or not, the fact remains that no further efforts were made by the plaintiffs to put their alleged covenants in written form so as to constitute an enforcible agreement between them and Mr. Hapeman as individuals and all efforts were expended in getting a legal status in existence as between the Village Board and Mr. Hape-man.
After the public hearing was held, as I have pointed out, the so-called restrictions subsequently appeared in the document entitled “ Certificate of Restrictions ”.
This was to supplement and carry out his agreement with the board, not with the individual property owners, his statement in the petition of January 3, 1947 that he “ hereby consents to restrictions whereby (a) no gasoline station shall be erected on the above described area, and (b) no business structure shall be erected on the above described area within fifty (50) feet, either of the easterly line of Portage Street or the northerly lines of Tuscarora Street and of the Creek Road Extension.”
*27 The above was construed by the board, only as written evidence of his willingness to have such restrictions imposed and not as the imposition of such restrictions themselves, as is evident from the discussion at the meeting.
At page 17 of Exhibit 13, Mr. Murphy, one of the speakers, stated: ‘ ‘ In regard to the possible restrictions which could be placed on the property, I doubt as to whether or not it can legally be restricted to any particular type of business.” Trustee Brown replied “I do not believe so.” Mr. Murphy then said: “I am wondering about the constitutional point involved about preventing a legitimate business from operating just because the village zoning law says it can’t.” Trustee Barnes then observed: “ If I am not mistaken, the Board has the power in the zoned area to control the type of business in that area but they cannot prevent a building to go on in one part and prevent it in another, but as a whole they can restrict it ”. He then inquired of the village attorney, “ Am I right? ”, to which Mr. Bice replied: “ Yes ”. At this point Mr. Murphy stated: “ Our Village Board says business can build on the street. Unless you amend the law, I don’t see how you can restrict anyone ”, to which trustee Brown answered, “It is a matter for the zoning law.” Thereupon the village attorney stated: “ It might be a matter of mechanics * * * and I don’t care to say that it can be done by a straight zoning change, but I do not (underscoring mine) think it can be done by the mechanics that the owner is willing to make the application to restrict his property.” The village attorney then commented “ I think if Mr. Hapeman is willing he could file a paper in the County and Village Clerks’ offices containing such restriction and these would be effective covenants running with the land.”
' These extracts from the minutes of the meeting show the events which led up to the writing out of the so-called ‘ ‘ Certificate of Bestrictions ”. The last and most significant question was the one put to Mr. Bice just before the close of the hearing when he asked Mr. Hapeman, “ if the Board [italics mine] should feel it isn’t sufficient for you to have it in that petition would you be willing to incorporate it in a separate instrument and file it in Lockport ”? to which Mr. Hapeman answered: “ Yes, so far as I am concerned, it is my petition and I expect to live up to it.”
Obviously, it was not the objective of the Village Board to have an alleged agreement between certain property owners and Mr. Hapeman as to self-imposed restrictions put into written enforcible form. The board’s insistence upon the Certificate *28 of Restrictions was to make legally enforcible its Zoning Ordinance, as amended. It was not composed and filed for any particular citizen. It was not intended to be a document which reduced the defendant’s previous oral statements to the plaintiffs to written form. The plaintiffs may have assumed that the so-called ‘1 Certificate of Restrictions ’ ’ constituted an agreement with them but that was not the fact. The evidence does not support the plaintiffs ’ claim that the Certificate of Restrictions was enacted for their benefit; therefore, the subject matter of its contents was of concern legally only to the Village Board and Mr. Hapeman.
In view of those findings, it is immaterial whether or not the plaintiffs knew of the so-called “ escape clause ” under which the board later assumed to act in authorizing the cancellation of the restrictions. In respect to that action, the minutes of October 2, 1950 state that: “Mr. Leo Hapeman appeared before the Board asking relief and removal of certain restrictions which he had imposed on his property located on Portage Street and Seneca Street.” It then appears that an appropriate resolution to cancel such restriction as to sub-lot 356 of the property described in the Certificate of Restriction was offered, seconded and carried unanimously by the affirmative votes of trustees Brown, Antolene, Bradshaw, Baddan and Mayor Anderson. After the cancellation of said restrictions by the board, Mr. Hapeman filed an appropriate document on November 8,1950 in the Niagara County Clerk’s office canceling the same.
Thus it appears that when the defendant on July 1, 1956 applied for a permit for a gasoline station there were no limitations on his property as heretofore restricting it to any particular type of business. The removal of such restrictions had been reaffirmed by the board as revealed by the minutes of the meeting on January 2,1951.
In view of these findings, it is apparent that the granting of the permit was not prohibited by any restriction of public record after that date. Therefore, whether or not it was legally issued must thus be determined by an examination of the applicable provisions of the Village Law and the Village of Lewiston Zoning Law. Did the board violate any section of the Village Law? No, because no regulation, restriction ov boundary was being changed which required the giving of notice to any property owner or citizen. Did the board violate any section of the Zoning Ordinances? No, because no provision of the Zoning Law was being changed which would have required a notice to be given.
*29 The claim of the defendant that he did not make the promises to which the plaintiffs testified is not persuasive. It is more likely to the contrary but the difficulty is that such statements were not reduced to an enforcible written document which could be recognized as a legal covenant running with the land. Despite the foregoing facts, there are some redeeming features which support the defendant’s position that the granting of any injunction would not be justified herein. It seems that some of the plaintiffs already were confronted with adjoining or nearby premises being used for business purposes. Particularly was this true in respect to the Rountree property. Mrs. Rountree related at the public meeting how her property and the adjoining property were prevented getting a loan from the bank because their premises were restricted to single dwellings while the people across the street would not say they wouldn’t sell their property for use for business purposes. Another mitigative factor is the fact that the Taylor property was subsequently rezoned for business purposes. It also seems a fair inference that the area involved in this section seems destined to continue to change in character toward a business one. The new road and the contemplated new power developments of which the court has judicial notice and common knowledge, no doubt will all tend to change the area in the neighborhood of the premises of both the defendant and the plaintiffs from one used for residences to one used for business purposes.
In addition to all of the foregoing, there are two well-established principles of law which militate against the plaintiffs in this litigation: (1) “ The law favors the free and unobstructed use of property ” (Premium Point Park Assn. v. Polar Bar, 306 N. Y. 507, 512) and (2) injunctive relief should be denied where it would “ bear heavily on the defendants, without benefiting the plaintiffs” (Forstmann v. Joray Holding Co., 244 N. Y. 22, 32).
In view of the foregoing which constitutes my decision as required by section 440 of the Civil Practice Act and which is being filed within the alloted time after the submission of the last brief or document of the parties, it is my conclusion that the complaint be dismissed, but without costs or disbursements.